UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KATHLEEN CHORBAGIAN,
MARK CHORBAGIAN,
REX CLARK, NANCY CLARK,
BROOKE KRIEBEL, JEFFREY KRIEBEL,        Case No.
CHRIS MILLER, TERRY MILLER,             Hon. _____
JASON PARSONS, TINA PARSONS,
JAMES ROGERS, MARY ROGERS, ERIC
TURNQUIST, KURT STANLEY,
DON TURSKEY, TERESA TURSKEY,
JOSEPH UHELSKI, BECKY UHELSKI,
DUANE WHITMAN, and BRENDA WHITMAN

      Plaintiffs,

-v-

UNITED STATES of AMERICA,

      Defendant.

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Kathleen & Mark Chorbagin, Rex & Nancy Clark, Brooke &

Jeffrey Kriebel, Chris & Terry Miller, Jason & Tina Parsons, James & Mary Rogers,

Eric Turnquist & Kurt Stanley, Don & Teresa Turskey, Joseph & Becky Uhelski,

and Duane & Brenda Whitman ("Plaintiffs"), by their attorneys, Rasor Law Firm,

PLLC., for their Complaint against the above-named Defendant, states as follows:

## **Introduction**

This case arises out of the May 19, 2020 Edenville Dam disaster occurring on the Tittabawassee River north of the City of Midland, Michigan. Plaintiffs' property was destroyed in the flooding caused by the failure of the dam. The Federal Government, through decades of negligence and failure to act in accordance with its own statutory obligations, was a major contributing factor to this disaster. This lawsuit seeks to hold the Federal Government accountable for the damages it caused by its unconscionable conduct.

Twenty-seven years ago in 1993, the Federal Energy Regulatory Commission ("FERC") recognized that the Edenville Dam posed a substantial risk to Michigan residents and property owners living downstream from the dam. At that time, FERC ordered the then-owner and operator of the Edenville Dam to make immediate improvements to the dam to prevent a catastrophic breach or flood downstream. Without these repairs and upgrades, the Edenville dam was a dangerous instrumentality.

In 2006, FERC, through its gross incompetency and deliberate indifference, transferred the license to operate this dangerous dam to a new owner, Boyce Hydro Power LLC ("Boyce"). FERC, in transferring the license to operate, had a mandatory duty to ensure that this known dangerous instrumentality would be operated safely. Indeed, FERC had already established the dam's dangers in 1993 under the previous

owner and knew that Boyce was taking control of a dam that posed an imminent threat.

After the Edenville dam failed on May 19, 2020, FERC Chairman Neil Chatterjee was called before members of Congress on June 18, 2020. Chatterjee admitted that FERC had issued a license to Boyce to operate the Edenville Dam without complying with its mandatory statutory obligation to first determine if Boyce could manage, operate, and maintain the dam safely. FERC's failure to vet Boyce was another direct cause of this disaster because, if FERC had performed its required due diligence, FERC would have determined that Boyce did not have the financial ability, competency or good faith motivation to make the dam safe or to protect the residents and property owners living downstream. Therefore, by FERC's own standards, Boyce was not qualified or eligible to operate a dam categorized as High Hazard.

For fourteen years after Boyce acquired its license, FERC allowed Boyce to defy numerous orders to make the dam safe. FERC knew that the Edenville dam was categorized as a High Hazard dam and a dangerous instrumentality, and it negligently entrusted this dangerous instrumentality to a recalcitrant, dishonest, under-capitalized, and incompetent operator.

On May 19, 2020, because of FERC's negligence, thousands of Michigan residents and property owners downstream suffered substantial property harm, and

in some cases catastrophic injuries, when the dam breached and water generated a 25-foot wave and ensuing flood.

FERC also had a mandatory duty to ensure that Boyce complied with all safety and emergency regulations. FERC, aware of the predicted rainstorms moving into the Midland Region, knew of the dangers at hand and had the authority to order a drawdown of the reservoirs behind the Smallwood, Secord and Sanford Dams. If FERC had ordered drawdowns before May 20, 2020, the collapse of the Edenville Dam would have been prevented.

FERC's negligence in refusing to order a drawdown and fulfilling its monitoring duties also contributed to the damages alleged in this lawsuit. FERC's negligence in this case spans multiple decades, dam owners, and Federal Administrations. The constants are FERC's statutory responsibility and the deteriorating condition of the dam that endangered the property and bodily integrity of the surrounding communities.

## **Jurisdiction, Venue, Parties and Exhaustion of Administrative Remedies**

1. This Court has subject matter jurisdiction over the Defendant because the United States of America is sued pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1).

2. Venue is proper in cases involving tort claims against the United States of America where the Plaintiff resides or where the act or omission complained of occurred. 28 U.S.C.§ 1402(b); 32 C.F.R. 759.32(a).

3. Plaintiffs reside in this Judicial District and the acts and omissions complained of occurred in this Judicial District, including damage to Plaintiffs' property during the Midland Dam collapse in May of 2020.

4. Defendant United States is sued based on acts taken during the operation of the Federal Energy Regulatory Commission ("FERC").

5. Plaintiffs, Donald and Teresa Turskey, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5455 Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

6. Plaintiffs, Eric Turnquist and Kurt Stanley, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 333 Island Drive, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

7. Plaintiffs, Jason and Tina Parsons, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5465

Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

8.  Plaintiffs, Kathleen and Mark Chorbagian are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5420 Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

9.  Plaintiffs, Joseph and Becky Uhelski, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5477 Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

10.  Plaintiffs, Jeffrey and Brooke Kriebel, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 329 Island Drive, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

11.  Plaintiffs James and Mary Rodgers, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 329

Island Drive, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

12.  Plaintiffs Chris and Terry Miller, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5438 Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

13.  Plaintiffs Rex and Nancy Clark, are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 331 Island Drive, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

14.  Plaintiffs Duane and Brenda Whitman are citizens of the State of Michigan and, at all times relevant hereto, owned real and personal property located at 5468 Heron Cove, Beaverton, MI on the now-non-existent Wixom Lake that was severely damaged, along with numerous other personal and real property loss, as a result of the May 19 Dam(s) collapse in Gladwin and Midland County.

15.  These matters are properly joined pursuant to Fed. R. Civ. P. 20(a)(1) as all the Plaintiffs' claims arise of the same negligent conduct by Defendant at the

same time, and resulted in similar damage to their properties as a result of the May 2020 Midland floods.

16.   Defendant's unlawful conduct resulting in these claims and Plaintiffs' damages involve common questions of law and fact pursuant to Fed. R. Civ. P. 20(a)(1)(B).

17.   Plaintiffs, individually and through their counsel, timely submitted a SF 95 administrative claim to the Federal Energy Regulatory Commission ("FERC") for personal and property damages arising out of the FERC's negligent handling of Boyce as the operator of the hydroelectric dams at issue.

18.   FERC acknowledged receipt of the SF 95 administrative claim on May 19, 2022.

19.   On November 10, 2022, counsel for Plaintiffs received correspondence from the Office of the Executive Director of the FERC denying the administrative claim.

20.   This lawsuit is timely filed within 6 months of the first notice of the denial of the administrative claim.

## STATEMENT OF FACTS

## History of FERC's Transfer of its License to Boyce and its 27-year Knowledge that the Edenville Dam was a Dangerous Instrumentality.

21.   Wolverine Power Corporation ("Wolverine"), a dissolved corporation, was a Michigan corporation that originally held the FERC license to operate the Edenville Project/Dam. Wolverine also owned the properties on which the Edenville Dam and other dams were located.

22.   In an August 6, 1993 letter from the Commission's Office of Energy Projects, Division of Dam Safety and Inspections, Chicago Regional Engineer ("Regional Engineer") to Wolverine, FERC advised that the spillway capacity of the Edenville Project did not meet the Commission's guidelines for passing the amount of water known as "probable maximum flood" ("PMF").

23.   FERC was aware of this life-threatening deficiency in the Dam's spillway capacity for almost 27 years prior to the May 19, 2020 Edenville Dam disaster.

24.   From 1993 to the day the Edenville Dam collapsed on May 19, 2020, FERC knew the unrepaired dam was a dangerous instrumentality.

25.   Synex Energy Resources Ltd., a subsidiary of Synex Power, Inc., reportedly acquired the real estate assets of Wolverine, including the Edenville Project, in a foreclosure proceeding in 2003. Synex Energy Resources then transferred those real estate assets to a new subsidiary, Synex Michigan, LLC.

26.   Synex Michigan, LLC thus acquired the operating business of Wolverine, including the purchase of Wolverine's remaining assets and the license to operate the Edenville Project/Dam from Wolverine on or about June 23, 2004.

27.  On or about March 17, 2006, Boyce purchased 100 percent of the interests of Synex Michigan, LLC.

28.  Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC, ("Boyce") and filed a statement with the Commission on July 12, 2007 to this effect.

29.  The Boyce Projects are located on the Tittabawassee River in Gladwin and Midland counties, in mid-Michigan. The Secord Project is the most upstream of the Boyce Projects. The Smallwood Project is located approximately seven river miles downstream from the Secord Project. Boyce's now-unlicensed Edenville Project (formerly FERC Project Number 10808), is located approximately 13 river miles downstream of the Smallwood Project, at the confluence of the Tittabawassee and Tobacco Rivers. The Sanford Project (the most downstream of the Boyce Projects) is located approximately 11 river miles downstream of Edenville Dam.

30.  The Edenville Dam is one of a group of four dams that were built in 1924 to generate hydroelectric electricity. It is located about 21 miles north of Midland on the Tittabawassee River.

31.  In addition to electric power generation, flood control is widely recognized as another key reason for dams being added to the Tittabawassee River.

32.  The other dams in the group are the Sanford, Smallwood and Secord.

33.  All four dams are earthen embankments with concrete spillways.

34.   The Edenville Dam was constructed in two sections: one embankment across the Tittabawassee River and one across the Tobacco River. The hydroelectric facilities built with this dam comprise 4.8 megawatts of total generation capacity. The electricity produced by the Edenville Dam has been sold under a long-term power purchase agreement with Consumers Energy, an investor-owned public utility. Water held by the dam formed a 2,600-acre reservoir called Wixom Lake. Water held by the Sanford Dam downstream formed the 1,569-acre Sanford Lake.

35.   The three Boyce Projects and the former Edenville Project are closely linked to each other, sharing common ownership and hydrology. Indeed, FERC issued the operative licenses for all four projects on the same day, noting that it intended to coordinate treatment of these four "hydrologically-related" projects in the future.

### FERC Subjected the Public To An Unreasonable Risk Of Harm By Licensing And Permitting Boyce To Operate The Dams Without Regard To Public Safety

36.   The four projects also are linked by Boyce's troubled compliance history. Its compliance failures at the formerly licensed Edenville Project were particularly egregious, as Boyce ignored FERC staff's dam safety requirements for 14 years.

37.   According to media reports, Boyce's primary interest in the Edenville Dam and the other dams was to use the properties as a tax shelter:

> [Boyce owner Lee] Mueller and his relatives needed to reinvest money from the sale of an Illinois property in less than a year-or pay $600,000 in taxes to

the IRS. Eventually, a solution came to Mueller, an architect who lives in Las Vegas, and his cousin, Michel d'Avenas, a California musician who is the son of a French count and is now known as the Pebble Beach Bagpiper. They would avoid taxes by purchasing four small hydroelectric dams in mid-Michigan near Midland .... The cousins had 45 days to find alternative sites and six months to buy one, or they risked having to pay more than $600,000 in capital gains taxes. Mueller and his associates identified the four Midland dams and buildings in Indianapolis and Houston as options and bought the dams in 2006 after borrowing money to complete the purchase.

38.  FERC routinely found Boyce's plans for auxiliary spillway work to be insufficient.

39.  Rather than fund the necessary repairs and upgrades to its dams, Boyce attempted to coerce community members into paying.

40.  In August 2010, the Sanford Dam's earthen dike began to seep. The next year, "Lee Mueller (Owner of Boyce) sa[id] he won't pay for the estimated $83,000 repair. Footing that bill is up to property owners and businesses that benefit from the 1,250-acre recreational impoundment in Midland County, he argue[d]..... He sa[id] if funds aren't raised for the repair work, Boyce Hydro will surrender its license to operate the dam and permanently drain Sanford Lake." One property owner characterized Boyce's actions as follows: "He's holding the dam hostage for someone else to fix it. Because he doesn't want to fix it."

41.  In 2012, Tobacco Township, a local government entity, sued Boyce for its failure to make repairs to the Edenville Dam.

42.  While Boyce had assured FERC that it would complete construction on auxiliary spillways in 2014, and 2015, it missed the 2014 deadline.

43.  FERC promulgated a plan to have Boyce construct one of the spillways in 2015. Boyce missed those deadlines as well. The two auxiliary spillways were never constructed.

44.  Not only did Boyce fail to construct the required spillways, it failed to even submit "complete and adequate plans" for the work.

45.  In 2015, Boyce failed to disclose to FERC that a spillway wall had failed. They attempted to repair the wall without reporting to FERC.

46.  FERC learned of and cited Boyce for these failures, stating, "[t]he licensee is presenting a serious risk to the infrastructure of this high hazard potential dam by performing unauthorized repairs and then providing no information about those repairs."

47.  In 2016, an independent safety inspection report found that Boyce "should continue to work for review and approval of the existing spillway rehabilitation projects which will allow the dam to safely pass the 100% PMF."

48.  FERC in a 2017 Report emphasized that Boyce's failures caused a 'grave' risk for the 'potential loss of life and destruction of property and infrastructure':

> Given Edenville dam's high hazard potential rating, the potential loss of life and destruction of property and infrastructure is grave should the project not be maintained and operated appropriately, with consequences that could certainly affect the Village of Sanford, Northwood University, City of

Midland, Michigan, and other areas downstream. The Commission's Dam Safety Guidelines require the project works to be designed to either withstand overtopping of the loading condition that would occur during a flood up to the probable maximum flood (PMF), or to the point where a failure would no longer constitute a hazard to downstream life and/or property. In the alternative, the capacity of the spillway must be adequate to prevent the reservoir from rising to an elevation that would endanger the safety of the project works. As summarized in an August 6, 1993 letter from the Regional Engineer to the prior licensee, the spillway capacity of the Edenville Project does not meet the Commission's guidelines for passing the PMF. The Regional Engineer has repeatedly directed the licensee to address the spillway capacity concerns at the project."

49. Consequently, in February 2018 the FERC recommended revocation of Boyce's license for the Edenville Project/Dam. It said:

The Commission's primary concern has been the licensee's longstanding failure to address the project's inadequate spillway capacity, which currently is designed to pass only approximately 50 percent of the PMF. Failure of the Edenville dam could result in the loss of human life and the destruction of property and infrastructure.

50. Finally, in 2018, due to the extreme hazards posed by the condition of the Edenville Dam and Boyce's callous indifference towards the lives and properties of others, FERC revoked Boyce's license to generate hydroelectric power from the Dam. FERC determined that Boyce "knowingly and willfully refused to comply with major aspects of its license" and had "repeatedly failed to comply" with directives to "develop and implement plans and schedules to address the fact that the [Edenville Dam's] spillways are not adequate to pass the probable maximum flood, thereby creating a grave danger to the public."

51. FERC observed that "the licensee [Boyce] has displayed a history of obfuscation and outright disregard of its obligations. We do not often revoke a license, but the licensee has left us with no other way to vindicate the public interest here."

52. Upon revocation of the license, jurisdiction over the Edenville Dam passed from FERC to the State of Michigan's Department of Environmental, Great Lakes and Energy ("EGLE").

53. Because FERC retained jurisdiction over the Sanford, Secord and Smallwood Boyce Hydroelectric Projects/Dams, FERC and the State of Michigan had joint jurisdiction over the four Hydroelectric dam projects at the time of the Edenville catastrophe.

54. On or about May 19, 2020, the Edenville Dam failed, resulting in catastrophic flooding to downstream areas. The Edenville Dam failed so completely that the downstream Sanford Dam suffered overtopping damage before breaching as well, causing areas even further downriver to be engulfed by floodwaters.

55. As a result of the cascading failure of the Edenville and Sanford Dams, more than 11,000 people living in Gladwin, Midland, and Saginaw Counties near Sanford Lake and the Tittabawassee River were forced to flee from imminent danger and seek higher ground. Many of their homes, businesses, and property have been destroyed, including Plaintiffs. Thousands of others who have not evacuated or

experienced property damage have nevertheless had their daily lives upended as the floodwaters continue to damage essential infrastructure in the area, such as bridges and roads, and have interfered with essential utilities services like sanitary sewage.

56.  In many cases, evacuees fleeing the rising floodwaters were cast further into harm's way. Like the rest of the country, the State of Michigan is in the midst of the COVID-19 Pandemic, with restrictions in place on movement and economic activity that severely limit the ability of evacuees to find safety outside of their homes. In the words of Michigan Governor Gretchen Whitmer, "to go through this in the midst of a global pandemic is almost unthinkable."

57.  On May 20, 2020, the day after the disaster, David E. Capka, P.E. Director Division of Dam Safety and Inspections of FERC wrote a letter to Boyce stating in part:

> Following the breach of the Edenville Dam, the Sanford Dam was overtopped by the increased inflow from the upstream breach. The overtopping flows led to a declaration of imminent failure by local authorities and triggered additional evacuation efforts. Due to the extensive damage to the projects and the region as a result of the floodwaters and the Edenville breach, you are directed to fully lower the reservoirs behind Sanford Dam, Smallwood Dam, and Secord Dam in a safe manner as flows recede. You are also directed to perform a dam safety inspection of these dams immediately and within 3 days after the flows recede.

58. On May 26, 2020, Mr. Capka wrote to Boyce again stating in part:

We do understand that the right embankment at Sanford Dam (P-2785) was fully breached during the high flows resulting from the Edenville Dam breach. Therefore, the directive to safely draw down the Sanford reservoir is moot due to the inability of the project to retain the reservoir. The drawdown

requirements at both Secord (P-10809) and Smallwood (P-10810) have not changed and you must draw each down to the spillway crest at a minimum. These actions are necessary in order for possible dam safety issues at your projects to be assessed. Depending on the results of the evaluations, you may be required to draw one or both reservoirs down further. It is your responsibility to ensure a safe drawdown rate based on all project factors, including embankment stability, spillway Project No. 2785 2 gate operations, and debris issues. You must not return either reservoir to "normal" levels until you have received authorization from FERC.

59.   As a result of the failure of the Edenville Dam, approximately 2,500 homes and buildings were damaged, approximately 150 of them catastrophically. The citizens and businesses of Gladwin, Midland, and Saginaw Counties are devastated. Their lives have been turned upside down, their homes and property destroyed, and their livelihoods ruined. The full scope of their losses has not yet come into view, and as the floodwaters recede, they face the growing uncertainty of months, if not years, of rebuilding and restoration.

60.   In June 2020, the State of Michigan estimated that the economic harm from failure of the Boyce facilities exceeded $200 million.

61.   This devastating event and the catastrophic consequences suffered by the communities harmed were entirely preventable because FERC indisputably knew for years that these Dams were inadequate, decrepit, unstable, unsafe, and would fail under predictable conditions, that Boyce should never have been licensed in the first place, and that Boyce was recalcitrant in its repeated refusal to take action to protect the public.

62.  The calamity befalling the citizens and businesses of Gladwin, Midland, and Saginaw counties is the direct and foreseeable result of the FERC's breach of its mandatory duty to ensure that before licensing Boyce it should determine if Boyce had the capacity and will to "manage, operate, and maintain the project safely." 16 U.S.C.§ 808(2).

63.  The failure of the Edenville Dam and the damages it caused under these circumstances is also the direct and foreseeable consequence of FERC's breach of its mandatory duty not to license, or to allow a license to continue, when it judges that the project is not best adapted to a comprehensive plan for flood control. 16 U.S.C. 803(a)(1). FERC failed in this mandatory duty by allowing Boyce to maintain its license long after determining that Boyce did not satisfy those standards.

### COUNT I—Violation of 16 U.S.C. §§ 803 and 808: FERC Failed in its Mandatory Duty to License a Dam Operator Only if it Determines that the Proposed Operator Can Operate the Dam Safely-Negligent Entrustment

64.  On the day that the Edenville Dam collapsed, FERC and the Michigan Department of Environment, Great Lakes, and Energy (EGLE) jointly regulated the hydroelectric power dams on Wixom, Secord, Smallwood and Sanford Lakes (Four Lakes).

65.  FERC, for 27 years before May 19, 2020, knew that the unrepaired Edenville Dam was a dangerous instrumentality that posed a grave risk of harm to Michigan residents and property owners living downstream.

66.  FERC had a mandatory duty under the Federal Power Act ("FPA") and its regulations to determine whether Boyce, as operator of the Four Lakes hydroelectric dam operations, had the financial ability and expertise to "manage, operate, and maintain the project safely." 16 U.S.C.§ 808(2)(B).

67.  FERC granted Boyce a license to operate the Edenville Dam in 2007 without making this mandatory assessment.

68.  If FERC had made the required assessment, it would not have negligently entrusted the operation of the dam to Boyce.

69.  At that time, and throughout the entirety of FERC's exercise of jurisdiction over it, the Edenville Dam was rated by FERC as a "High Hazard Dam" because its failure would cause loss of human life.

70.  When FERC transferred the license to Boyce it knew it was permitting it to be the operator of a dangerous instrumentality unless the necessary repairs and upgrades were made.

71.  On June 18, 2020, FERC Chairman Neil Chatterjee admitted in testimony before Congress that FERC had issued a license to Boyce to operate the Edenville Dam without complying with its mandatory statutory obligation to first determine if it could manage, operate, and maintain the dam safely.

72.  Within a short time after receiving its license to operate, Boyce, through its flagrant non-compliance with FERC orders to make the Edenville Dam safe,

demonstrated to FERC that it did not have the financial resources, know-how, willingness, or good faith motivation to eliminate the characteristics of the dam which made it a dangerous instrumentality or to carry out its operations safely.

73. The collapse of the Edenville Dam on May 19, 2020 was the direct result of FERC's failure to comply with the legal mandate to grant a license only to a financially sound and competent operator who would operate a High Hazard Dam safely. If FERC had followed its mandate, the disaster would not have occurred because Boyce would not have been granted a license.

74. Boyce's repeated recalcitrance, unwillingness, or inability to repair, operate and maintain the Dam in a safe manner caused the Dam to collapse. FERC's negligent failure to comply with its mandatory duty to determine Boyce's fitness to operate the dam is a direct and proximate cause for the injuries and damages experienced by Plaintiffs.

75. The Federal Tort Claims Act provides that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C.§ 267.

76. Michigan recognizes the tort doctrine of negligent entrustment. The two elements of the tort are that the entrustor (FERC) negligently entrusted the dangerous

instrumentality (Edenville Dam) to the entrustee (Boyce) and the entrustee (Boyce) negligently or recklessly misused the instrumentality. *Allstate Ins. Co. v. Freeman*, 160 Mich. App. 349, 357, 408 N.W.2d 153 (1987), aff'd 432 Mich. 656, 443 N.W.2d 734 (1989), mod 433 Mich. 1202, 446 N.W.2d 291 (1989).

77.  FERC had a mandatory duty to grant Boyce a license in the first instance only if it determined that Boyce was fit to operate a High Hazard Dam safely. FERC never fulfilled this mandatory statutory obligation.

78.  The Edenville Dam was rated a High Hazard dam and in failing to follow this statutory mandate, FERC negligently entrusted the ultra-hazardous activity to Boyce who recklessly misused its license.

79.  A reasonably prudent licensor would have required Boyce to make the necessary upgrades and repairs to render the dam safe before it issued Boyce a license.

80.  In addition, FERC violated its mandatory duty as a licensor every day that it allowed Boyce to continue operating the Edenville Dam under a federal license despite knowing that Boyce did not maintain the project in a manner best adapted to a comprehensive plan for flood control. 16 U.S.C. § 803(a)(1).

81. Over the years, FERC allowed Boyce to flaunt federal regulations and maintain the Dams in a condition that endangered everybody in the area, including Plaintiffs.

82. As a result of FERC's enable-ism, Boyce Hydro was emboldened over a thirteen-year period to leave the Dams in conditions dangerous to all the surrounding areas.

83. Having entrusted Boyce these dangerous instrumentalities, and tacitly encouraged Boyce to recklessly allow the persistent dangerous conditions by allowing the same, FERC's negligence exceeds that of a regulator.

84. This incident giving rise to Plaintiffs' damages was a creature of FERC's own making, far exceeding simply the negligent operation by Boyce.

85. By emboldening Boyce's tortious conduct via its unfettered entrustment, FERC actively assumed a responsibility to the surrounding areas (including Plaintiffs).

86. FERC is therefore liable for the damages it caused by entrusting the operation of a High Hazard dam to an unfit and reckless dam operator in the first instance (in violation of FERC's mandatory duties under § 808) and by continuing to permit the licensee to operate the dam in a manner that was not suited to a plan for flood control (in violation of FERC's mandatory duties under § 803).

**COUNT II—Violation of 16 U.S.C. § 823b: FERC Failed in its Mandatory Duty to Monitor the Integrity of Dams Under its Jurisdiction-Negligence**

87. The FPA, 16 U.S.C. § 823b, provides that the "Commission [FERC] shall monitor and investigate compliance with each license and permit issued under this subchapter…"

88. This duty to "monitor" includes the obligation to monitor the integrity of dams under its jurisdiction.

89. Prompt detection and evaluation of information from instrumentation and physical monitoring is critical to a timely emergency response.

90. When a dam is not continuously attended and an incident could endanger life or cause significant property damage, it is imperative that instrumentation be installed and/or procedures developed to monitor the conditions of the facility.

91. To promptly identify and notify emergency management authorities of emergency conditions, FERC has a mandatory statutory obligation to work with the dam owner and co-jurisdictional authorities to detect, confirm and evaluate developing conditions.

92. This obligation may include the installation of remote surveillance systems that include instrumentation for continuous monitoring of conditions.

93. At the time of the Edenville Dam collapse, despite these mandatory requirements, FERC and Boyce had in place either inadequate or non-existent emergency surveillance and monitoring instrumentation or procedures and it was this failure which contributed to the dam's demise.

94.   In the days and weeks prior to the failure of the Edenville Dam, FERC was aware of the weather reports for the Midland Region, and notwithstanding its knowledge of the dangers posed by excessive rainfall, failed to use ordinary care in caring out its mandatory obligation to monitor the integrity of dam structures under its jurisdiction. As a result of this negligence, Plaintiffs experienced a substantial loss of property.

95.   In recognition of this obligation to monitor dam integrity, FERC on May 20, 2020, the day after the Edenville Dam collapse, ordered Boyce to lower the water level of Sanford, Smallwood and Secord reservoirs.

96.   FERC had the authority to order Boyce to draw down the reservoirs of the Smallwood, Secord and Sanford dams as demonstrated by the May 20, 2020 post Edenville Dam collapse orders of FERC Engineer Mr. Capka.

97.   Had FERC exercised this authority to order a draw down in a competent and non-negligent manner before May 20, 2020, the Edenville Dam disaster could have been prevented.

98. FERC's failure to exercise its authority to order a draw down directly caused the catastrophic flooding that resulted from the failure of the Edenville Dam.

## DAMAGES

99. The impact of the dam failure has resulted in significant hardships and stress on all Plaintiffs. In addition to the property not being able to be used for its

intended purpose of living and the loss of a lake-front property significantly decreasing the property value, expenses have resulted and continue to result.

100. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Donald and Teresa Turskey sustained catastrophic damage to their real and personal property located at 5455 Heron Cove, Beaverton, MI, including but not limited to $1,025,374.46 in personal injury and property damages.

101. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs, Eric Turnquist and Kurt Stanley sustained catastrophic damage to their real and personal property located at 333 Island Drive, Beaverton, MI, including but not limited to $1,315,543.35 in personal injury and property damages.

102. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Jason and Tina Parsons sustained catastrophic damage to their real and personal property located at 5465 Heron Cove, Beaverton, MI, including but not limited to $1,156,437.28 in personal injury and property damages.

103. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Kathleen and Mark Chorbagian sustained catastrophic damage to their real and personal property located at located at 5420 Heron Cove, Beaverton, MI, including but not limited to $1,246,606.59 in personal injury and property damages.

104. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Joseph and Becky Uhelski sustained catastrophic damage to their real and personal

property located at located at 5477 Heron Cove, Beaverton, MI, including but not limited to $1,235,172.47 in personal injury and property damages.

105. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Jeffrey and Brooke Kriebel sustained catastrophic damage to their real and personal property located at located at 329 Island Drive, Beaverton, MI, including but not limited to $1,335,689.33 in personal injury and property damages.

106. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs James and Mary Rodgers sustained catastrophic damage to their real and personal property located at located at 329 Island Drive, Beaverton, MI, including but not limited to $1,061,230.97 in personal injury and property damages.

107. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Chris and Terry Miller sustained catastrophic damage to their real and personal property located at located at 5438 Heron Cove, Beaverton, MI, including but not limited to $1,140,457.04 for personal injury and property damages.

108. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Rex and Nancy Clark sustained catastrophic damage to their real and personal property located at located at 331 Island Drive, Beaverton, MI, including but not limited to $1,331,073.36 in personal injury and property damages.

109. As a result of the failure of the Edenville and Sanford Projects, Plaintiffs Duane and Brenda Whitman sustained catastrophic damage to their real and personal

property located at 5468 Heron Cove, Beaverton, MI, including but not limited to $1,188,960.14 in personal injury and property damages.

## **REQUEST FOR RELIEF**

Accordingly, the Plaintiffs request $11,724,001.64 in restitution and damages for the repair of the homes and replacement of lost items, personal injury expenses, and loss of property value, and for the emotional distress caused by FERC's negligence.

Respectfully submitted,

RASOR LAW FIRM, PLLC

*/s/James B. Rasor*
James B. Rasor (P43476)
Attorney for Plaintiffs
201 E. Fourth Street
Royal Oak, MI 48067
248-543-9000
Jbr@rasorlawfirm.com

DATE: May 9, 2023

## **PROOF OF SERVICE**

The undersigned hereby certifies that on May 9, 2023, she caused the foregoing instrument to be filed with the Court using the ECF filing system, which will provide service upon all counsel of record.
*/s/Stephanie Moore*